IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,                    Case No. 3:09-mj-0048 CMK

               Plaintiff,

                                   JUDGMENT

Brian Ganoe, Donald McKay, and
Mac McFarlin,

               Defendants.

_____

     This case came on regularly for trial on July 20, 2010,  at the United States District Court in Redding, California, the Honorable Craig M. Kellison, United States Magistrate Judge, presiding; the United States appeared by and through Matthew C. Stegman, Assistant United States Attorney; Joseph Cook, Certified Law Clerk, and Robert D. Sweetin, Certified Law Clerk; and the defendants, Brian Ganoe, Donald McKay and Mac McFarlin, appeared by and through retained counsel, David Young.

     By way of an Information filed on August 3, 2009, the defendants are charged  with violating § 261.9(a)[1] in Count I,  "damaging any natural feature or other property of the United

_____

[1] **36 C.F.R. § 261.9**

The following are prohibited:

*(a) Damaging any natural feature or other property of the United States.*
(b) Removing any natural feature or other property of the United States.

1

States;" § 261.12(c)[2] in Count II, "damaging and leaving in a damaged condition any such road,

trail, or segment thereof;" § 261.12(d) in Count III,  "blocking, restricting, or otherwise

interfering with the use of a road, trail, or gate;" § 261.6(a)[3] in Count IV,  "cutting or otherwise

/ / /

---

(c) Damaging any plant that is classified as a threatened, endangered, sensitive, rare, or unique species.
(d) Removing any plant that is classified as a threatened, endangered, sensitive, rare, or unique species.
(e) Entering any building, structure, or enclosed area owned or controlled by the United States when such building, structure, or enclosed area is not open to the public.
(f) Using any pesticide except for personal use as an insect repellent or as provided by special-use authorization for other minor uses.
(g) Digging in, excavating, disturbing, injuring, destroying, or in any way damaging any prehistoric, historic, or archaeological resource, structure, site, artifact, or property.
(h) Removing any prehistoric, historic, or archaeological resource, structure, site, artifact, property.
(i) Excavating, damaging, or removing any vertebrate fossil or removing any paleontological resource for commercial purposes without a special use authorization.
(j) Excavating, damaging, or removing any cave resource from a cave without a special use authorization, or removing any cave resource for commercial purposes.


[2] **36 C.F.R. § 261.12**

The following are prohibited:
(a) Violating the load, weight, height, length, or width limitations prescribed by State law except by special-use authorization or written agreement or by order issued under § 261.54 of this Chapter.
(b) Failing to have a vehicle weighed at a Forest Service weighing station, if required by a sign.
*(c) Damaging and leaving in a damaged condition any such road, trail, or segment thereof.*
*(d) Blocking, restricting, or otherwise interfering with the use of a road, trail, or gate.*


[3] **36 C.F.R. § 261.6**

The following are prohibited:
*(a) Cutting or otherwise damaging any timber, tree, or other forest product, except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation.*
(b) Cutting any standing tree, under permit or timber sale contract, before a Forest Officer has marked it or has otherwise designated it for cutting.
(c) Removing any timber or other forest product cut under permit or timber sale contract, except to a place designated for scaling, or removing it from that place before it is scaled, measured, counted, or otherwise accounted for by a forest officer.
(d) Stamping, marking with paint, or otherwise identifying any tree or other forest product in a manner similar to that employed by forest officers to mark or designate a tree or any other forest product for cutting or removal.
(e) Loading, removing or hauling timber or other forest product acquired under any permit or timber sale contract unless such product is identified as required in such permit or contract.
(f) Selling or exchanging any timber or other forest product obtained free use pursuant to 223.5 through 223.11.
(g) Violating any timber export or substitution restriction in 223.160 through 223.164.
(h) Removing any timber, tree or other forest product, except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation.
(i) Violating the Forest Resources Conservation and Shortage Relief Act of 1990 (16 U.S.C. 620, et seq .), or its implementing regulations at 36 CFR 223.185-223.203.

damaging any timber, tree, or other forest product. . .;" § 261.10(a)[4] in Counts V through VIII, "constructing, placing, or maintaining any kind of road . . . or other improvement on National Forest System lands or facilities without a special-use authorization, contract, or approved operating plan when such authorization is required," relating to the construction of water pipelines (Count V), access road (Count VI), settling pond (Count VII) and the installation of a gate (Count VII).

Each of these offenses is punishable by a fine of not more than $ 5,000,

///

///

---

[4] **36 C.F.R. § 261.10**

The following are prohibited:

*(a) Constructing, placing, or maintaining any kind of road, trail, structure, fence, enclosure, communication equipment, significant surface disturbance, or other improvement on National Forest System lands or facilities without a special-use authorization, contract, or approved operating plan when such authorization is required.*
(b) Construction, reconstructing, improving, maintaining, occupying or using a residence on National Forest System lands unless authorized by a special-use authorization or approved operating plan when such authorization is required.
(c) Selling or offering for sale any merchandise or conducting any kind of work activity or service unless authorized by Federal law, regulation, or special-use authorization.
(d) Discharging a firearm or any other implement capable of taking human life, causing injury, or damaging property as follows:
　　　(1) In or within 150 yards of a residence, building, campsite, developed recreation site or occupied area, or
　　　(2) Across or on a National Forest System road or a body of water adjacent thereto, or in any manner or place whereby any person or property is exposed to injury or damage as a result in such discharge.
　　　(3) Into or within any cave.
(e) Abandoning any personal property.
(f) Placing a vehicle or other object in such a manner that it is an impediment or hazard to the safety or convenience of any person.
(g) Commercial distribution of printed material without a special use authorization.
(h) When commercially distributing printed material, delaying, halting, or preventing administrative use of an area by the Forest Service or other scheduled or existing uses or activities on National Forest System lands; misrepresenting the purposes or affiliations of those selling or distributing the material; or misrepresenting the availability of the material without cost.
(i) Operating or using in or near a campsite, developed recreation site, or over an adjacent body of water without a permit, any device which produces noise, such as a radio, television, musical instrument, motor or engine in such a manner and at such a time so as to unreasonably disturb any person.
(j) Operating or using a public address system, whether fixed, portable or vehicle mounted, in or near a campsite or developed recreation site or over an adjacent body of water without a special-use authorization.
(k) Use or occupancy of National Forest System land or facilities without special-use authorization when such authorization is required.
(l) Violating any term or condition of a special-use authorization, contract or approved operating plan.
(m) Failing to stop a vehicle when directed to do so by a Forest Officer.
(n) Failing to pay any special use fee or other charges as required.
(o) Discharging or igniting a firecracker, rocket or other firework, or explosive into or within any cave.
(p) Use or occupancy of National Forest System lands or facilities without an approved operating plan when such authorization is required.

1  imprisonment for not more than six months, or both.[5]

2  # I.  THE TRIAL

3  The charges stem from property damage and the unauthorized  construction of

4  improvements on National Forest System lands during 2007 and 2008 allegedly done by the

5  defendants during the course of their mining activities in Siskiyou County, California, within the

6  boundaries of the Klamath National Forest.   Much of the focus at trial related to a landslide that

7  occurred on a portion of a Forest Service road lying directly above the defendants' mining site.

8  The terms, landslide, slide, slump, slumping and failure were used interchangeably during trial to

9  describe the condition of the damaged forest road.   The court shall simply refer to the event as

10  the "slide."

11  On July 10, 2008, Defendant Donald McKay [McKay] wrote a letter [Gov. Ex. 3] to the

12  District Ranger of the Klamath National Forest informing him that a portion of Forest Service

13  Road 48N08 [N08] had "slumped" and was rendered "unstable and not safe."  McKay authored

14  said letter apparently on behalf of himself, Defendant Brian W. Ganoe [Ganoe] and Defendant

15  Mac McFarlin [McFarlin] collectively as owners of the Pay Streak Mine [Paystreak] which lies

16  downhill and adjacent to the slide.   The District Ranger, Kenneth Harris [Harris], did not act or

17  respond to the letter immediately because of extreme forest fire activity on other portions of the

18  Klamath National Forest.   Harris, along with Forest Service representatives, John Hendricks, Jim

19  Main, Curt Hughes, Jim Davis and Ed Rose visited the site on September 8, 2008.   Harris recalls

20  meeting with Ganoe and viewing the slide and adjacent areas including the Paystreak.   Harris

21  recalls Ganoe telling him that "they had done some mining there" and had constructed a pond for

22  "wildlife enhancement."    Harris observed that the slide had rendered the N08 unusable, and that

23  a number of trees between the slide and the Paystreak were down, damaged and scarred.

24

25  [5]  36 C.F.R. 261.1b  provides that [a]ny violation of the prohibitions of this part (261) shall be punished by a fine of not more than $500 or imprisonment for not more than six months or both pursuant to title 16 U.S.C. , section 551, unless

26  otherwise provided.  Part (261) prohibitions are defined as Class B misdemeanors  under 18 U.S.C.  3559(7);  and are classified as "petty offenses" pursuant to 18 U.S.C. 19.  Under 18 U.S.C.  3571(b)(6), the maximum fine was increased to $5,000.

Curtis Hughes [Hughes], the Land and Minerals Officer for the Klamath National Forest testified that he had accompanied Harris and others to the site on September 8th.  Hughes recalled inspecting the slide, also noting the downed and damaged trees.  He testified that there was considerable new surface disturbance to the area.  Hughes had last been in the area in 2005.  Hughes testified that he believed an access road [New Road] had recently been constructed leading from the N08 downhill to the base of the Paystreak.  Upon closer inspection, Hughes observed that several trees had been pushed out of the way to build the New Road.  Hughes further testified that he had conversed earlier in the summer with McKay who volunteered that "they were prospecting with a mini excavator."  During the site inspection on the 8th, Hughes testified that he also observed that a gate had been constructed along another access road leading to the mine.  Hughes also recalls meeting Ganoe during the site meeting on the 8th wherein Ganoe had introduced himself as a "retired geologists with the Department of Agriculture."  Hughes testified that Ganoe informed him that they had not done anything wrong because the site had been previously mined in past years and was a disturbed area.  Hughes testified that he reminded Ganoe that he was familiar with the site and that it had been reclaimed prior to the new ownership.

Hughes testified that he had visited the area of the Paystreak on at least five occasions between the early 1990's and his inspection on September 8, 2008.  He was aware that the mine had been operated in the past by other individuals, but does not recall any mining activity on the site between 1993 and 2007.

Law Enforcement Officer Edward Hendricks [Hendricks] also visited the site on September 8, 2008.  Hendricks testified that Ganoe had informed him that "they" had brought in heavy equipment two months earlier "looking for ore."  Ganoe also volunteered that they had constructed the pond for "wildlife."  When questioned about the existing gate, Ganoe told Hendricks that "they" had installed it and had it locked.   Hendricks testified that McKay admitted to cutting into the hill to release water.

James Davis [Davis], an engineer with the Forest Service, testified that he also was present during the on site inspection on September 8th.  Davis recalls conversing with Ganoe regarding the repair necessary to rebuild the damaged road.  Davis informed Ganoe that any repair would require an environmental assessment and be subject to Environmental Impact Statement requirements.

Two days following the on- site meeting at the slide and Paystreak,  McKay sent three separate letters to the Forest Service. [Exs. 4 and 5].   Exhibit 5 is a cover letter enclosing a proposed Plan of Operations [POO] which was backdated to July 29, 2008.  This July 2008 POO was submitted on behalf of McKay and Ganoe as owners of the Paystreak Mine.  The POO described the construction of a settling pond for "wildlife enhancement," collection of water through pipes from the hillside and the "infrequent use of a 450 Cat dozer and a small Takahici mini excavator."   A third letter apologizes for the late filing of the parties' Notice of Intent [NOI] to mine indicating that the defendants  "did not know it was needed."  Since McKay also requested that the POO be considered retroactively, it is also assumed that much of the work contemplated in the POO had already been commenced, i.e. construction of the settling pond, use of mechanical equipment, etc.

On September 30, 2008, Forest Service representatives Ken Stagg, Jim Davis, Ed Rose, Angie Bell and Juan de la Fuente again visited the site to assess the slide. [Ex. D p. 164]

On December 11, 2008, McKay and Ganoe submitted a revised POO with an amended date of November 11, 2008. [Ex. 6].   In this revised POO, McKay and Ganoe indicate that they "[i]nstalled a gate on lower entrance for safety and security."  Again the revised POO describes collecting water through a pipe and "a small pond (approximately 8 feet across) that we built for any possible erosion and wildlife enhancement."  The use of a "450 John Deere dozer" and "a small Takehici mini excavator" are also indicated.

In a letter to the Forest Service dated January 16, 2009 (Ex. 7) Ganoe, again describing himself as a certified professional geologist, opines that "[d]ewatering and pulling the toe

1  material from the base at the mine entrance may have contributed to the stability problem."[6]

2      Although Ganoe does not describe who initiated the excavation work in the "late summer

3  and the fall of 2007," and to what extent, McKay concedes that the discovery date of the

4  Paystreak as it related to the defendants, herein, was June 29, 2007.  [Ex. 5].  In this regard,

5  Exhibit 7 proves more helpful.   In a letter dated January 16, 2009 from Ganoe to Harris, he

6  admits that he began excavating in late summer of 2007.

7      On February 19, 2009, Ganoe and McKay again met with Forest Service personnel.

8  When discussing the cause and origin of the slide, Ganoe and McKay apparently conceded that

9  the slide was probably caused by their earth moving activities under the road.  Ganoe and McKay

10 acknowledged that they had released water that had been backed up which when released

11 weakened the upper road. [Ex. D, p 167].  During this meeting Ganoe represented himself as a

12 retired geologist.

13     Juan de la Fuente [de la Fuente],[7] a forest service geologist for the Klamath National

14 Forest, visited the site and observed the slide on September 30, 2008.  At trial, de la Fuente

15 opined that the landslide was caused by the removal of material at the base and toe of the slope

16 lying below the roadway.  During cross examination, de la Fuente conceded that his opinion was

17 based on the analysis performed by fellow employee Ed Rose.

18     Edward K. Rose [Rose],[8] is currently the regional geotechnical and dams engineer for the

19

20     ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

21     [6]     Ganoe notes in this letter that a "small pvc drain was installed that removed most of the water from the old mine entrance but the same soil and rock stability problems were encountered.  The site was buried under tons of soil and other debris

22 when it was first encountered.  When this material was removed, water that was flowing out a pipe above this site ceased and tons of water and debris flowed out the old mine entrance.  This excavation occurred in late summer and the fall of 2007.  It was noted in May, 2008 when access was gained to the site, that the road was starting to subside. . . . Dewatering and pulling the toe

23 material from the base at the mine entrance may have contributed to the stability problem, but this is normal mining exploration. Removing water and water laden debris from the old shafts and adits removed further internal support."

24

25     [7]  De la Fuenta is a Registered Professional Geologist with a degree in geology from UCLA.

26     [8]  Rose received a degree in geology from the University of Toledo, and subsequently received masters degrees in geology and geotechnical engineering from Toledo and the University of California, respectively [Ex. 32].

1   northern region of the forest service encompassing the national forests in Montana and northern

2   Idaho.  At the time of the slide and subsequent investigation into its cause, Rose was the

3   geotechnical engineer for the northern California province which includes the Klamath National

4   Forest.  Rose testified that he visited the site on four occasions.  Rose opined that the removal of

5   material at the base or toe of the slope was the cause of the slide.

6        The defendants called Donald Olsen [Olsen],[9] as their expert who opined that the slide

7   was most likely caused by high water content in the soil which accumulated during the winter of

8   2007-2008.  Olsen surmises that as a result of the wet winter, the ground above and supporting

9   the N08 became saturated ultimately resulting in the collapse. [Ex. G].[10]

10       The defendants did not testify.

11  ## II.  APPLICABLE LAW

12       It is clear from the evidence that defendants Ganoe and McKay were involved in mining

13  operations at the Paystreak Mine prior to the slide.  As set forth above, Ganoe admitted to

14  mining, dewatering, use of heavy equipment, construction of the pond, and installation of the

15  gate.  McKay admitted to prospecting, dewatering, use of a mini excavator and the installation of

16  the lower gate.  Olsen testified that the defendants told him that they had recently graded the

17  access road.  The defendants failed to submit a NOI (§ 228.4(a)), or obtain a POO (§ 228.4(c)),

18  relating to their work or mining operations at the Paystreak prior to the failure of the N08, despite

19  

20     [9] Olsen is a Registered Civil Engineer, Professional Geologist, Certified Engineering Geologist and Certified

21  Hydrogeologist [ Ex. E].   Olsen is a principal in the engineering firm of Holdrege & Kull of Chico, California.  The court's reference to the Olsen reports refers to the reports of Holdrege & Kull.  [Ex. F & G].

22     [10] Olsen's analysis is outlined in detail in the Holdrege & Kull Reports  wherein he opines "that percolation of rain water collected in the old existing prospect pit during the entire winter rainy season saturated the soil and rock material underlying the slope.  The significant decrease in shear strength of these soil and rock materials triggered the slope failure.

23  . . .

    Conclusions:

24  1.  The landslide mechanism is a shallow plastic soil failure and not a deep seated bedrock failure.

    2.  The landslide occurred as a result of the following conditions: the soil became fully saturated during the rainy winter months

25  causing the steep 1H:1V road cut made by the USFS personnel situated directly upslope from USFS Road 48N08 to become unstable and fail.

26  3. The prospecting activities performed by the present owners of the Paystreak Mine did not contribute to or cause the landslide to occur on USFS  Road 48N08. . . ."

the fact that these activities clearly envisioned the use of heavy equipment (§§ 228.4 (a)(vi) and

228.12),[11] and involved operations likely to cause "significant disturbance of surface resources."

§ 228.4(a).

An act or omission listed in Part 261 not authorized by a permit issued under § 261.1a,

or otherwise authorized, is punishable as provided in 16 U.S.C. § 551. Permits are generally in

the form of special use permits issued under Part 251. Section 251.50(a) provides that "[a]ll use

of National Forest System land, . . . except those provided for in the regulations governing . . .

minerals and mineral materials (Part 252), . . . are 'special uses' and must be authorized. . . ." A

system other than use permits has been established for minerals and mineral materials. That

system of regulation is found in Part 252. When the statute and the regulations give miners a

statutory right to go upon and use the open public domain for purposes of mineral exploration

and development, forest service officials may not unreasonably restrict that right by applying

general forest service regulations and a permit system.

The forest service may properly regulate the surface use of forest lands. While the

regulation of mining per se is not within forest service jurisdiction, where mining activity

disturbs National Forest System lands, forest service regulation is proper. United States v.

Weiss, 642 F.2d 296, 298 (9th Cir. 1981) (Secretary of Agriculture has "power to adopt

reasonable rules and regulations regarding mining operations within the national forests");

United States v. Richardson, 599 F.2d 290 (9th Cir.1979), cert. denied, 444 U.S. 1014 (1980)

(recognizing the conflict between mining and forest land policies and holding that the district

court may properly enjoin unreasonable destruction of surface resources).  United States v.

Goldfield Deep Mines Co., 644 F.2d 1307, 1309 (9th Cir. 1981), cert. denied, 455 U.S. 907

(1982); United States v. Doremus, 888 F.2d 630, 632 (9th Cir.1989), cert. denied, 498 U.S. 1046

---

[11] Unless otherwise noted all references to Part 250, 251, 252 and 260 pertain to Title 36 of the Code of Federal Regulations.

1   (1991).    In reaffirming the Forest Service's authority to regulate mining, the court in Doremus,

2   supra at 632,  rejected a miner's contention that conduct "reasonably incident[al]" to mining

3   could not be so regulated, and left no doubt that the Department of Agriculture possesses

4   statutory authority to regulate activities related to mining in order to preserve the national forests.

5   16 U.S.C. § 551.  Doremus clearly supports the use of § 261 prohibitions against miners so long

6   as the mining operations are not "unreasonably circumscribed as to amount to a prohibition."

7   See also,  United States v. Weiss, supra at 299.  The court in Doremus also found that the § 261

8   prohibitions do not conflict with 30 U.S.C. § 612 because the regulatory right of the Forest

9   Service does not "endanger or materially interfere with mining operations."  Id. at 632.

10   Mining operations are defined in part by 30 U.S.C. § 612(a) and more specifically in §

11   228.3. The regulation defines "operations" as follows:

12   All functions, work, and activities in connection with prospecting, exploration, development, mining
     or processing of mineral resources and all uses reasonably incident thereto, including roads and other
13   means of access on lands subject to the regulations in this part, regardless of whether said operations
     take place on or off mining claims.

14

15   The national forests are to be open for entry "for all proper and lawful purposes, including

16   that of prospecting, locating, and developing the mineral resources thereof." 16 U.S.C. § 478.

17   However, "(s)uch persons must comply with the rules and regulations covering such national

18   forests."  Id.    Thus it is clear that persons entering the national forests to prospect, locate, and

19   develop mineral resources therein are subject to and must comply with the rules and regulations

20   covering the national forests.

21   When the potential for "significant disturbance" of Forest Service lands arises, the

22   mining operator is required to submit a NOI to the District Ranger who will assess the operator's

23   proposed mining operations.  § 228.4(a).  If the Forest Service determines that the proposed

24   operations "will likely cause a significant disturbance of surface resources," the operator is

25   required to submit a proposed POO to address the impact upon Forest Service lands. §228.4(a)(2)

26   and (3).  Not surprisingly, once a POO is required, the operator's costs rise exponentially.  An

1    "environmental assessment" may then become necessary (§§ 228.4(f) and 228.8), and possibly

2    the need to post a reclamation bond. §§ 228.8(g) and 228.13.

3         Section § 551, of Title 16 also grants authority to the Secretary to make "rules and

4    regulations and (to) establish such service as will insure the objects of such reservations, namely,

5    to regulate their occupancy and use and to preserve the forests thereon from destruction . . ."

6    The section specifically states that the Secretary shall make provision for the protection of the

7    national forests against destruction by fire and depredation. Thus, the Secretary has been given

8    the authority to promulgate reasonable rules and regulations which will protect the national

9    forests and which will help to carry out the purposes for which the national forests were created.

10   The regulations in question, Part 252, were designed to minimize adverse environmental impacts

11   on the surface resources of the national forests.

12                              **III.  DISCUSSION**

13   **The Slide.**

14        Much of the trial was devoted to expert opinion regarding the slide's causation.    From

15   the outset, it must be stressed that the evidence amply supports the finding that defendants

16   McKay and Ganoe were involved in mining operations at the Paystreak and particularly at the

17   base of the N08 at periodic times preceding its failure.  This involved the removal of material at

18   the base or "toe" of the slide, dewatering, the use of mechanical equipment and the construction

19   of various improvements.  The defendants' mining activities at the Paystreak were done or

20   performed without a POO or special use authorization.  The opinion testimony of de la Fuente

21   and Rose, coupled with the admissions of Ganoe and McKay support the finding that defendants'

22   mining activities, which included dewatering and material removal from the base of the slope,

23   were the cause of the slide.  Ganoe opined that "dewatering and pulling the toe material from the

24   base at the mine entrance may have contributed to the stability problem," [Ex.7] and McKay

25   concedes the slide probably occurred because of defendants' earthmoving activities under the

26   road. [Ex. D].

1   The court is also guided by common sense.  The evidence that the defendants excavated

2   and removed material and water at the base or "toe" of the slope below the N08 during a period

3   of time prior to its failure cannot be ignored or glossed over by unsupported conjecture.  The

4   court does not arrive at this finding based simply on preconceived notions of gravity and simple

5   physics.  Both de la Fuente and Rose testified that the type of rock and material found in the

6   slope when disturbed increased the chance of slope failure.  Ganoe was also concerned and aware

7   of the inferior quality of rock and soil lying below the N08.  [Ex. 7].  De la Fuente testified that

8   these concerns should have been addressed in a POO.  Other witnesses for the forest service

9   testified that a POO would never have been approved given the concerns with the soil make-up

10  and the danger of its potential removal.  In a detailed analysis, the forest service concluded that

11  the  "[r]emoval of material at the toe of the slope (below the road at the raw rock face) where

12  mining and excavation has occurred is the most probable cause for the failure of this entire slope

13  from above the road cut to the existing excavation below the road."  [Exs. 33 and 36].

14  The court also received expert testimony outlined in detailed reports from both Rose and

15  Olsen concerning slope stability which measures the possibility of slope failure or non failure,

16  and also the degree of failure or non-failure.  Simply stated, if the forces available to resist

17  movement are greater than the forces driving movement, the slope is considered stable.  Both

18  experts used the "Safety Factor" [SF] as an established numerical value in slope stability analysis

19  which measures the possibility of failure or non-failure.  The SF has a value greater than "1"

20  when the resisting forces are greater than the driving force, and a SF value less than "1" when the

21  driving forces overcome the resisting forces.   Adding to the complexity of these tests were the

22  assumptions employed by both experts including the material properties of the soil, cohesion of

23  materials, saturation of the soil and the angle of friction. [Exs. G and 36].

24  In Olsen's slope stability analysis, he opines that the failure was predicated on a high

25  water table or complete saturation of the road prism.  Olsen speculates "that percolation of rain

26  water collected in the old existing prospect pit during the entire winter rainy season saturated the

12

soil and rock material underlying the slope [and] [t]he significant decrease in shear strength of these soil and rock materials triggered the slope failure." [Ex. G. p.8].   In Olsen's report he claims that the prospect pit above the road was full of water at the time of his visit on July 17, 2009, yet photograph # 3 to his report (apparently taken on June 30, 2009) appears to belie this claim.  At trial, Olsen testified that this prospect pit  "could have filled with water," which contradicts the observations in his report that it was filled with water during the time of his initial visit.

At the end of the day, however, the court is still left with the fact that the slide took place within a short period of time following defendants removal of material and water from the base of the N08. Ganoe best describes this cause and effect sequence in his letter of January 16, 2009, to Harris. [Ex. 7]. [12]

Olsen opined that the slide was the result of saturated soil resulting from the wet winter of 2007-2008.  Olsen testified that the heavy spring rains in 2008 more than likely caused or increased the soil saturation.  On cross examination, however, Olsen conceded that he merely assumed that the area was subjected to a wet winter and rainy spring, admitting that he had not done any background investigation or research to support such a conclusion.  Olsen testified that he did not live near the area of the Paystreak, and had not visited the area during the winter of 2007-2008.  Olsen did not rely on any documented weather history of the area relating to the periods in question.  When pressed further on this issue, Olsen conceded that he simply assumed that it had rained more than usual.  Olsen did not explain why the winter of 2007-2008 would have had such a remarkable effect on a road that had been in existence almost 70 years.

More troubling, however, was Olsen's apparent resistance to explore the possibility that

_____

[12]   "The site was buried under tons of soil and other debris when it was first encountered.  When this material was removed, water that was flowing out a pipe above the site ceased and tons of water and debris flowed out the old mine entrance. This excavation occurred in the late summer and the fall of 2007.  It was noted in May, 2008 when access was gained to the site, that the road was starting to subside.  The subsidence did not stabilize and got worse . . ."

1  the removal of material by the defendants was the cause or contributed to the slide.  The court

2  acknowledges his role as an expert for defendants and the direction this must necessarily take.

3  Unfortunately, Olsen bases his opinion that the slide was the result of excessive soil saturation

4  merely upon his assumption that winters are wet and that the defendants had engaged in little or

5  no mining activity.[13]

6        When first meeting with the defendants on-site to inspect the slide, Olsen chose to take

7  no notes and was told by the defendants that they had removed only a few tons or cubic yards of

8  material.  Of course, this estimate differs dramatically with the estimate of material removed as

9  set forth in Exhibit 36 and the testimony of de la Fuente, which suggests that as much as  2,000

10  cubic yards may have been removed.   [Ex. G. p 4].   Choosing not to accept either estimate, the

11  court is still satisfied that whatever amount of material was removed by the defendants, such

12  removal was the contributing cause of the slide.  Olsen also testified that the defendants had

13  assured him that no material had been removed from the site.  Unexplained, however, is what

14  defendants did with the tons of soil and debris admittedly removed by them during the summer

15  and fall of 2007. [Ex. 7].   Although, Olsen was not bound by de la Fuente's estimate, the court

16  was unimpressed with Olsen's lack of background investigation and deliberate ease in arriving at

17  assumptions unsupported by facts.

18        Not to be ignored are the inculpatory admissions by defendant Ganoe.  As set forth above,

19  Ganoe on several occasions conceded that the removal of material by defendants may have

20  caused the slide.  An issue at trial involved whether these admissions would be considered lay, or

21  treated in the context of expert testimony since Ganoe was a licensed "professional geologist."

22  Since Ganoe did not elect to testify, however, his qualifications did not become an issue and the

23  _____

24      [13]    In the Olsen report [Ex. G. p. 5]  he notes "that present owners of the Paystreak Mine have only performed minor
prospecting activities and have not yet performed any mining activities at the site."  As stated above, the evidence supports the

25  contrary.  Defendants admit beginning excavation at the site in the late summer of 2007 and describe the removal of tons of soil
and other debris. [Ex. 7].  Olsen apparently also dismisses without comment Ganoe's opinion in the same letter that the slide was
caused by the removal of material at the base of the mine entrance and dewatering.

26

1    court agreed to consider the admissions, if any, only as lay opinion.

2        Despite the court's ruling to consider Ganoe's admissions as only lay opinion, however,

3    the defendants chose to introduce Exhibit D into evidence which included Ganoe's professional

4    certifications.  In his letter of January 16, 2009 [Ex. 7] to the Forest Service, Ganoe introduces

5    himself as a certified professional geologist and opines that "[d]ewatering and pulling the toe

6    material from the base at the mine entrance may have contributed to the stability problem . . .

7    [r]emoving water and water laden debris from the old shafts and adits removed further internal

8    support."

9        Despite the contradiction in having Exhibit D admitted into evidence, the court will

10   simply treat Ganoe's admission that he believed his mining operations were either the cause or a

11   contributing factor to the slide, as just that.  The court will not ignore his educational background

12   degree and professional licenses in geology, since they simply reinforce the other evidence

13   received by the court including Ganoe's assessment of the poor quality of the soil and rock

14   underlying the N08. [Ex. 7].  Since sufficient expert testimony was received to address causation,

15   it makes little difference whether Ganoe's opinion is treated as lay or expert.[14]

16       In Count 1, defendants are charged with "damaging any natural feature or property of the

17   United States."  § 261.9(a).  The government has established beyond a reasonable doubt that

18   the mining activity of defendants Ganoe and McKay caused the slide of forest service road N08.

19       Hughes, Hendricks and Davis all recalled conversations with Ganoe involving his mining

20   operations before the slide.  These admissions were reinforced by Ganoe in a meeting with forest

21   service personnel on February 19, 2009. [Ex. D p. 167].  Similarly, Ganoe's letter of January 16,

22   2009 [Ex. 7] not only confirms his involvement in the mining activity, but includes his opinion

23   _____

24       [14]    This is consistent with Instruction 4.14 of the Ninth Circuit Model Criminal Jury Instructions.
         4.14 OPINION  EVIDENCE, EXPERT WITNESS

25       "You have heard  testimony from persons who, because of education or experience, were permitted to state opinions and the
         reasons for their opinions.  Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and

26       give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the
         opinion, and all the other evidence in the case."  See also, Fed. R. Evid. 602, 701–05.

as to the slide's causation.  Ganoe also appeared to co-author the two proposed POOs which both describe the proposed excavation at the mine. [Exs. 5 and 6].   These POOs are backdated and incorporate language in the past tense when referring to contemplated mining operations. Additional evidence at trial also reinforces the fact that mining activity began as early as June 2007.  [Ex. 5].[15]

McKay also co-authored the same POOs.  The July 2008 POO described the construction of a settling pond and the use of a 450 Cat dozer and a small Takahici mini excavator.  As set forth above, the court is convinced that these POOs were backdated and reference contemplated activities that had already occurred or were in place at the time of the slide.  In a letter dated September 10, 2008, to the forest service [Ex. 5], McKay apologizes for his tardy submission of his NOI to mine the Paystreak mine.  Hughes testified that on September 8, 2008, he met with McKay at the mine site.  During this conversation McKay indicated the he was prospecting and admitted to using a mini excavator.  Finally, McKay was also in attendance at the February 19, 2009 meeting with the forest service personnel, wherein McKay admitted to the release of accumulated water and conceded "that it was probably their earth moving activities under the road that caused it to slip." [Ex. D. P 167].   During this same meeting, Hendricks recalled McKay stating that after cutting into the hill, water began to flow.

The damage to road N08 was significant, which included the loss of timber and vegetation.  The evidence supports the finding that the defendants' removal of material at the base or "toe" of the slope caused the road to fail.   Although, the defendants suggest other possible or potential theories of road failure, the expert testimony to support said theories was either wanting or unconvincing.

For these reasons, defendants Ganoe and McKay are guilty of damaging forest service

---

[15]  Since McKay requested that the amended POO be considered retroactive to the date of discovery, the court assumes that much of the work contemplated in the amended POO was already commenced or completed.  This would include the excavation and removal of material, pipe installation, pond construction and the use of mechanized equipment.  Of course the photographs and admissions of Ganoe and McKay already confirm the latter conclusion.

1  property in violation of § 261.9(a).  As to defendant McFarlin, the government has not satisfied

2  its burden of proof.[16]

3        In Count II, defendants are charged with "[d]amaging and leaving in a damaged condition

4  any such road, trail, or segment thereof."  For the reasons set forth above, the court finds

5  defendants Ganoe and McKay guilty of causing the damage to forest service road N08 in

6  violation of § 261.12(c).  As to defendant McFarlin, the government has not satisfied its burden

7  of proof.

8        In Count III, defendants are charged with "[b]locking, restricting, or otherwise interfering

9  with the use of a road, trail, or gate."

10        This Count pertains to the fact that the N08 suffered significant damage and was rendered

11  unusable as a result of the slide.  For the reasons set forth above, the court finds defendants

12  Ganoe and McKay guilty of violating of § 261.12(d).  As to defendant McFarlin, the government

13  has not satisfied its burden of proof.

14        In Count IV, the defendants are charged with "cutting or otherwise damaging any timber,

15  tree, or other forest product" between June 2007 and September 2008.  The court assumes that

16  these charges relate to both the damage to trees that were destroyed as an unintended

17  consequence of the slide, and also to the trees and vegetation that were allegedly removed or

18  cleared in the  construction or grading of the New Road leading from the N08 to the base of the

19  Paystreak.  The government contends that the defendants constructed the New Road in

20  furtherance of their mining operations.

21        Unclear to the court is the origin and history of the New Road.  Some of the evidence

22  _____

23     [16]  Of course, proposed Ex. A, suggests that defendant McFarlin had prior mining experience and may actually have
24  played a major role in the defendants' mining operations at the Paystreak.  Since this exhibit was not received into  evidence,
   however, there simply was insufficient evidence to find McFarlin guilty of any of the charges in the Information.  As discussed
25  below, the manner in which proposed Exhibit  A, may be treated in future civil litigation, if any, between the parties is an issue
   not before the court.  Other than proposed  Exhibit A, however, none of the witnesses specifically recalled any conversations
   with McFarlin.  He did not author or co-author either of the proposed POOs [Exs. 5 & 6] or their cover letters.  He did not attend
26  the forest service meeting on February 19, 2009, and although he attended the meeting on September 29, 2009, he did not
   participate in any of the discussions. [Ex. D].

suggests that this road either existed, or was constructed during a prior occupancy.  During the 1980's and 1990's the mine was owned and occupied by Irvin and Don Uptegrave [Uptegraves].  In the POOs submitted by the Uptegraves, the evidence suggests either the anticipated construction or the existence of a road or spur leading from the N08 to the base of the mine.  [Ex. D].  Although Hughes testified that it appeared evident that grading work had recently been done on a road leading from the N08 to the staging area, he did not know if the road was in existence prior to defendants' occupancy.  Davis also testified that he was unsure whether this road existed prior to 2007.

Hughes testified that when observing the road in question, it appeared recently graded with several small trees being pushed out of the way.  Although the photographs introduced at trial confirm that the roadway had been recently graded, the court is not convinced that the downed timber adjacent to the roadway appearing in Exhibits 21, 22, 29, 31 and 32 was the result of defendants' road clearing or grading activity, as opposed to being caused by the slide.  The evidence certainly lends support to the former conclusion, but the court is not convinced beyond a reasonable doubt.  The court is unable to conclude that timber (other than the small trees alluded to by Hughes) was damaged in the grading of the new road.  [Ex. 15-18].  Although the testimony and photographs indicate the scarring or debarking of one or more trees, the court is not willing to treat this damage as a violation of § 261.6(a).  This makes little difference, however, since the court finds that the defendants did violate § 261.6(a) with respect to the unintended damage done to the timber as a result of the slide.

Section 261.6(a) impose strict liability on anyone, "cutting or otherwise damaging any timber, tree, or other forest product."  In United States v. Wilson, 438 F.2d 525 (9th Cir.1971), the court held that violations of § 261.6(a), an offense made punishable as a misdemeanor by 16 U.S.C. § 551, does not require a criminal intent.  Section 261.2 defines "damaging" as "to injure, mutilate, deface, destroy, cut, chop, girdle, dig, excavate, kill or in any way harm or disturb."  Hughes testified that he observed numerous trees leaning down the road and new surface

1  disturbance as a result of the slide.  The photographs received into evidence  and the testimony of

2  Hughes and Hendricks adequately support a finding that "log timber sized trees had fallen into

3  the pit" at the base of the road as a result of the slide.  Since damaging includes activities such as

4  destroying, digging, excavating, killing, harming or disturbing, the court finds that defendants

5  Ganoe and McKay are guilty of violating § 261.9(a) because their mining activity causing the

6  slide resulted in damage to trees and vegetation caught in its path.  As to defendant McFarlin, the

7  government has again not satisfied its burden of proof.

8        In Counts V through VIII, the defendants are charged with "[c]onstructing, placing, or

9  maintaining any kind of road, trail, structure, fence, enclosure, communication equipment,

10  significant surface disturbance, or other improvement on National Forest System lands or

11  facilities without a special-use authorization, contract, or approved operating plan when such

12  authorization is required."   It is clear from the evidence that the defendants conducted their

13  mining operations and the construction of the improvements set forth in Counts V through VIII

14  without an approved POO.  Hendricks testified that Ganoe indicated that he did not have a POO

15  or "permits," during his visit on September 8, 2008.  In letters to the forest service following the

16  slide, McKay submitted backdated POOs while apologizing for defendants' tardy compliance.

17  Since defendants activities involved mining, the special use requirements of § 251.50 are

18  inapplicable.

19        Counts V and VII relate to the unauthorized maintenance or construction of a PVC

20  pipeline and settling pond at the mine site.  Olsen testified that he was told by the defendants that

21  they installed pipe in an existing underground pipe that fed the pond.   Both of the proposed

22  POOs [Exs. 5 & 6] authored by Ganoe and McKay discuss the collection of water into pipes.  On

23  page 3 of both POOs, defendants Ganoe and McKay concede that the water is being "collected

24  and flows into a small pond (approximately 8 feet across) that we built for any possible erosion

25  and wildlife enhancement."  Hendricks testified that Ganoe admitted to constructing the pond for

26  wildlife purposes.  In the meeting with forest service personnel on February 19, 2009, both

19

1  McKay and Ganoe stated that they believed that their dewatering efforts contributed to the failure

2  of the N08. [Ex. D p. 167].   In his letter of January 16, 2009 to the forest service, Ganoe also

3  describes these dewatering efforts. [Ex. 7].   The court finds the evidence sufficient to find that

4  both McKay and Ganoe were involved in the construction and maintenance of the PVC piping

5  and the settling pond.

6          Hughes could not rule out that previous owners of the mine may have also utilized the

7  same pipes and settling pond for their operations.  In fact, the Uptegrave POOs [Ex. D] indicate

8  that pipes and a settling pond were contemplated in the 1980s.  It is clear to the court, however,

9  that the Uptegraves' mining operations ended many years earlier (as early as 1993), and that the

10  efforts of defendants Ganoe and McKay in utilizing pipes or the pond, (whether remedial or the

11  result of new construction) is still tantamount to "maintaining" these improvements on forest

12  service land without special use authorization or an approved POO.  The court finds the

13  defendants Ganoe and McKay  guilty of violating § 261.10(a) as to Counts V and VII.   As to

14  defendant McFarlin, the government has again not satisfied its burden of proof.

15          Count VI relates to the construction or maintenance of a road on forest service lands.

16          As mentioned above, the government established that the defendants were utilizing an

17  access road between N08 and the base of the Paystreak referred to as the New Road.  Although,

18  the government failed to establish beyond a reasonable doubt that its use and maintenance

19  resulted to damage to trees and timber under § 261.9(a), the government did establish beyond a

20  reasonable doubt that the defendants were using and maintaining said road for their operations.

21  Fresh equipment tracks were present on the roadway during the visit by the forest service on

22  September 8, 2008. [Ex. 15 & 16].  Hughes testified that the road appeared to have been recently

23  bladed with smaller trees pushed to the side. [Ex. 21].  Hendricks testified that during this

24  September 8th visit,  Ganoe admitted to having heavy equipment on the site prior to the slide.

25  Davis testified that the road in question had fresh scars where equipment had been, and that it

26  appeared that material from the hillside had been removed and placed on the road.  In the

proposed POOs [Ex. 5 & 6] defendants Ganoe and McKay describe this road as the upper old entrance road noting that it "is still open, but little used."  This claim would appear to contradict the testimony of Hughes, Hendricks and Davis who all claimed that the road in question was recently graded and improved.  When Olsen met with the defendants on-site, they admitted to its grading.

As with the piping and settling pond, there is evidence to suggest that this New Road may have been in existence or constructed during Uptegraves' occupancy. [Ex. D].  Hughes and Davis could not rule out this possibility.   The court does find, however, that the defendants undertook new efforts to either construct the New Road or perform considerable repair work to an existing road which involved widening and grading with mechanical equipment.

With few exceptions, any type of road construction or road maintenance on forest service lands requires either special use authorization or approval by way of a POO.  §§ 251.50[17]; 228.4[18]; 228.12[19].

---

[17]  36 C.F.R. § 251.50

(a) All uses of National Forest System lands, improvements, and resources, except those authorized by the regulations governing sharing use of roads (§ 212.9); grazing and livestock use (part 222); the sale and disposal of timber and special forest products, such as greens, mushrooms, and medicinal plants (part 223); and minerals (part 228) are designated "special uses." Before conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer, unless that requirement is waived by paragraphs (c) through (e)(3) of this section. . . . .

[18]  § 228.4 Plan of operations--notice of intent--requirements.
. . .
(c) The plan of operations shall include:
. . .
(2) A map or sketch showing information sufficient to locate the proposed area of operations on the ground, existing and/or proposed roads or access routes to be used in connection with the operations as set forth in § 228.12 and the approximate location and size of areas where surface resources will be disturbed.
(3) Information sufficient to describe or identify the type of operations proposed and how they would be conducted, the type and standard of existing and proposed roads or access routes, the means of transportation used or to be used as set forth in § 228.12, the period during which the proposed activity will take place, and measures to be taken to meet the requirements for environmental protection in § 228.8.

[19]  § 228.12 Access.
An operator is entitled to access in connection with operations, but no road, trail, bridge, landing area for aircraft, or the like, shall be constructed or improved, nor shall any other means of access, including but not limited to off-road vehicles, be used until the operator has received approval of an operating plan in writing from the authorized officer when required by § 228.4(a). Proposals for construction, improvement or use of such access as part of a plan of operations shall include a description of the

1    Again, there is insufficient evidence to find that McFarlin was involved in either the

2    maintenance or improvement of the road in question.  The court does find that McKay and Ganoe

3    were involved in such activity and finds them guilty of violating § 261.10(a).

4        In Count VIII the defendants are charged with installing or maintaining a gate on forest

5    service property.

6        The Paystreak is also served by another access road that connects to forest service road

7    48N31.  This access road is not a maintained forest service road, but still is located on federal

8    land.  Olsen mistakenly argues that the gate and road are private because they are part of the

9    Paystreak mine. [Ex. G p. 14].  Since ownership of unpatented mining claims does not equate to

10   fee ownership, the gate and access road are not located on private property, and the right to

11   maintain said improvements is subject to regulation by the forest service.

12       Hughes testified that he first observed the installed gate on September 8, 2008, at the time

13   of his site visit.  Hendricks testified that during the September 8th visit that Ganoe admitted to

14   installing the gate.  In the revised POO (Ex. 5), both Ganoe and McKay indicate that they

15   "[i]nstalled a gate on lower entrance for safety and security."  On cross examination, Olsen

16   testified that during his first meeting with defendants that they admitted to installing the gate to

17   keep the public out and for safety reasons.  Olsen was told by the defendants that the uninstalled

18   gate was already on site when defendants became the owners of the Paystreak, and that it was

19   simply rehung at its former location.  Assuming this is true, however, the rehanging or

20   reinstallation of the gate is tantamount to "constructing" or "maintaining" under § 261.10(a).

21   The court finds defendants Ganoe and McKay guilty of violating § 261.10(a), and as to defendant

22   McFarlin, the government has not satisfied its burden of proof.  Although, Olsen testified that the

23   defendants admitted to installing the gate, no evidence was received attributing any such

24

25   type and standard of the proposed means of access, a map showing the proposed route of access, and a description of the means
     of transportation to be used. Approval of the means of such access as part of a plan of operations shall specify the location of the
26   access route, design standards, means of transportation, and other conditions reasonably necessary to protect the environment and
     forest surface resources, including measures to protect scenic values and to insure against erosion and water or air pollution.

admission from McFarlin directly.

## IV.  CONCLUSION

**For these reasons, the Court concludes that**:

(1)  The evidence supports beyond a reasonable doubt that defendants Ganoe and McKay were involved in mining operations (including excavation and dewatering) on forest service lands which caused forest service road N08 to fail resulting in damage to property of the United States in violation of  § 261.9(a), and the court finds said defendants guilty thereof.  The court finds defendant McFarlin not guilty.

(2) The evidence supports beyond a reasonable doubt that defendants Ganoe and McKay were involved in mining operations (including excavation and dewatering) on forest service lands which caused forest service road N08 to fail resulting in damage to said forest service road in violation of § 261.12(c), and the court finds said defendants guilty thereof.  The court finds defendant McFarlin not guilty.

(3)  The evidence supports beyond a reasonable doubt that defendants Ganoe and McKay were involved in mining operations (including excavation and dewatering) on forest service lands which caused forest service road N08 to fail resulting in the blockage of forest service road N08 in violation of  § 261.12(d), and the court finds said defendants guilty thereof.  The court finds defendant McFarlin not guilty.

(4) The evidence supports beyond a reasonable doubt that defendants Ganoe and McKay were involved in mining operations (including excavation and dewatering) on forest service lands which caused forest serve road N08 to fail resulting in damage to timber, trees and other forest products in violation of § 261.6(a) and the court finds said defendants guilty thereof.  The court finds defendant McFarlin not guilty.

(5) The evidence supports beyond a reasonable doubt that defendants Ganoe and McKay were involved in mining operations which included constructing, repairing, reconstructing and "maintaining" improvements upon forest service lands without special use authorization or

23

1   approval by way of a POO in violation of § 261.10(a), and the court finds said defendants guilty

2   thereof in Counts V through VIII.  The court finds defendant McFarlin not guilty.

3   **Restitution**.

4       The government seeks restitution in this matter.

5       While it is true that federal courts do not have the inherent power to award restitution,

6   and may do so only pursuant to statutory authority, United States v. Hicks, 997 F.2d 594, 600 (9th

7   Cir. 1993), the court is authorized by statute to impose certain conditions of probation under 18

8   U.S.C. § 3563(b).[20]

9       The authority to impose restitution derives from  § 3556, which provides that a court may

10  order restitution in accordance with §§ 3663A or 3663.  Section 3663A  defines the criteria for

11  mandatory restitution under the Mandatory Victims Restitution Act of 1996 [MVRA], which

12  orders restitution for offenses that fall within Titles 18 and 21 of the United States Code.

13  Section 3663 defines the criteria for permissive restitution, which authorizes restitution of

14  offenses described within Titles 18, 21, and 49 of the United States Code.  These two sections

15  provide that a federal court generally may order restitution as part of a sentence itself when the

16  defendant is convicted of a specified collection of statutes under the specified Titles.  This

17  collection of statutes, however, does not include the statutes defendants violated here, which fall

18  under offenses within Title 36, Code of Federal Regulations and Title 16, United States Code.

19      The court may require the defendants to make restitution to a victim of the offense under

20  § 3556  "but not subject to the limitation of § 3663(a) or 3663A(c)(1)(A)."   The Ninth Circuit

21  has interpreted that language to mean that when a court sentences a convicted defendant to a term

22  of probation, it may include a condition that he pay restitution to a victim, regardless of whether

23  the offense of conviction is listed in §§  3663 or 3663A.  See United States v. Gamma

24  Tech.Indus., Inc.,  265 F.3d 917, 924 n.7 (9th Cir. 2001)("Although Gamma Tech was not

25

26      [20]   Unless otherwise noted, all sections relating to the issue of restitution pertain to Title 18, United States Code.

1  convicted of an offense specified in § 3663(a)(1), which refers only to offenses in Titles 18, 21

2  and 49 of the United States Code, the district court properly imposed restitution as a

3  discretionary condition of Gamma Tech's probation under § 3563(b)(3)"); see also United States

4  v. Butler, 297 F.3d 505, 518-20 (6th Cir. 2002)  interpreting §§ 3563(b) and 3583(b) as

5  permitting restitution as a condition of supervised release in a Title 26 tax evasion case); United

6  States v. Bok, 156 F.3d 157, 166 (2d Cir. 1998)(same); United States v. Dahlstrom, 180 F.3d

7  677, 686 (5th Cir. 1999)(same in securities fraud case).  This provision of  § 3563(b)(2) has been

8  interpreted to except restitution from the limitations described in section 3663(a) when said

9  restitution is ordered as a condition of probation.  See Gall v. United States, 21 F.3d 107, 109-10

10  (interpreting § 3563(b)(2) as "expressly negat[ing]" the limitations under § 3663(a) "where

11  restitution is ordered as a condition of probation . . ."); see also  United States v. Lexington

12  Wholesale Co., Inc., 71 Fed.Appx. 507, 508 (6th Cir.2003) ("[W]here restitution is imposed as a

13  condition of probation, the provisions of § 3563(b), the Probation Statute, override the

14  limitations of § 3663.") (citing Gall, 21 F.3d at 110).

15         Since, imposing restitution as a term of probation under § 3653(b)(2) is discretionary,

16  reference to the statutory factors a court should consider in declining to impose restitution is

17  relevant.  § 3663(a)(1)(B)(i)[21].  Such factors include the amount of loss, financial resources of the

18  defendants and more importantly whether the complexity in determining restitution outweighs

19  the need to provide restitution.

20  / / /

21

22

    [21]

23  (B)(i)  The court, in determining whether to order restitution under this section, shall consider--

24  (I) the amount of the loss sustained by each victim as a result of the offense; and
    (II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's
25  dependents, and such other factors as the court deems appropriate.
    (ii) To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the
26  fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may
    decline to make such an order.

                                              25

1  <u>1.  Amount of Loss.</u>

2        The court received dramatically conflicting estimates to repair, or reconstruct the road.

3  The government's estimates range between $ 175,000 and $ 400,000 (Exs. 30 and 36); and the

4  defendants' estimates range between $ 3,000 and $ 5,000.  [Ex. F].[22]   At trial, the court indicated

5  that the issue of restitution would be addressed post-trial, and that the amount, if any, would be

6  arrived at in accordance with the procedures set forth in § 3664[23].

7  _____

8        [22]   Even adopting the defendants' proposed method of repair as suggested by Olsen, the government estimates that the environmental cost for such repair would approximate $ 82,000 and the construction cost would approximate $ 43,000.  [Ex. 30].

9

10        [23]   § 3664. Procedure for issuance and enforcement of order of restitution

11  (a) For orders of restitution under this title, the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant. If the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court.

13  (b) The court shall disclose to both the defendant and the attorney for the Government all portions of the presentence or other report pertaining to the matters described in subsection (a) of this section.

14  (c) The provisions of this chapter, chapter 227, and Rule 32(c) of the Federal Rules of Criminal Procedure shall be the only rules applicable to proceedings under this section.

15  (d)(1) Upon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution.

16  (2) The probation officer shall, prior to submitting the presentence report under subsection (a), to the extent practicable--
(A) provide notice to all identified victims of--

17  (i) the offense or offenses of which the defendant was convicted;
(ii) the amounts subject to restitution submitted to the probation officer;

18  (iii) the opportunity of the victim to submit information to the probation officer concerning the amount of the victim's losses;
(iv) the scheduled date, time, and place of the sentencing hearing;

19  (v) the availability of a lien in favor of the victim pursuant to subsection (m)(1)(B); and
(vi) the opportunity of the victim to file with the probation officer a separate affidavit relating to the amount of the victim's losses subject to restitution; and

20  (B) provide the victim with an affidavit form to submit pursuant to subparagraph (A)(vi).

21  (3) Each defendant shall prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the defendant's dependents, and such other information that the court requires relating to such other factors as the court deems appropriate.

22  (4) After reviewing the report of the probation officer, the court may require additional documentation or hear testimony. The privacy of any records filed, or testimony heard, pursuant to this section shall be maintained to the greatest extent possible, and such records may be filed or testimony heard in camera.

24  (5) If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing. If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order. Such order may be granted only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief.

26  (6) The court may refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendations as to disposition, subject to a de novo determination of the issue by

the court.

(e) Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant. The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires.

(f)(1)(A) In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.

(B) In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.

(2) Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of--

(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

(B) projected earnings and other income of the defendant; and

(C) any financial obligations of the defendant; including obligations to dependents.

(3)(A) A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments.

(B) A restitution order may direct the defendant to make nominal periodic payments if the court finds from facts on the record that the economic circumstances of the defendant do not allow the payment of any amount of a restitution order, and do not allow for the payment of the full amount of a restitution order in the foreseeable future under any reasonable schedule of payments.

(4) An in-kind payment described in paragraph (3) may be in the form of--

(A) return of property;

(B) replacement of property; or

(C) if the victim agrees, services rendered to the victim or a person or organization other than the victim.

(g)(1) No victim shall be required to participate in any phase of a restitution order.

(2) A victim may at any time assign the victim's interest in restitution payments to the Crime Victims Fund in the Treasury without in any way impairing the obligation of the defendant to make such payments.

(h) If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

(i) If the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim. In any case in which the United States is a victim, the court shall ensure that all other victims receive full restitution before the United States receives any restitution.

(j)(1) If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

(2) Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in--

(A) any Federal civil proceeding; and

(B) any State civil proceeding, to the extent provided by the law of the State.

(k) A restitution order shall provide that the defendant shall notify the court and the Attorney General of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay restitution. The court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim. The Attorney General shall certify to the court that the victim or victims owed restitution by the defendant have been notified of the change in circumstances. Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require.

(l) A conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law, brought by the victim.

(m)(1)(A)(i) An order of restitution may be enforced by the United States in the manner provided for in subchapter C of chapter 227 and subchapter B of chapter 229 of this title; or

(ii) by all other available and reasonable means.

(B) At the request of a victim named in a restitution order, the clerk of the court shall issue an abstract of judgment certifying that

27

1      These procedures begin by referring the matter to a probation officer to determine the

2  amount of restitution.  The probation officer has the initial responsibility for providing a report

3  containing information sufficient for the court to fashion a restitution order, including an

4  accounting of losses to each victim, any restitution owed pursuant to a plea agreement, and the

5  economic circumstances of a defendant.  § 3664(a).  Due to the complexity of issues involved in

6  the repair or reconstruction of the N08, the court concludes that reference of these issues to a

7  probation officer would not prove efficient and not be in the best interest of the parties or the

8  court.

9      Here, the parties' cost of repair estimates differ drastically. The government's estimate is

10  more than 130 times greater than that of the defendants.  Certainly, the defendants' estimate

11  appears overly optimistic (even bordering on fantasy), while the government's estimates are

12  laden with endless layers of bureaucratic fluff.

13      The court also recognizes the possibility that reconstruction or repair of N08 may not

14  occur for a variety of reasons, including the forest service's reassessment of cost and need.

15  If abandonment of the N08 was to be an alternative to repair, then the cost of repair may not be

16  an appropriate consideration in determining restitution.  In other words, the fact that the

17  _____

18  a judgment has been entered in favor of such victim in the amount specified in the restitution order. Upon registering, recording, docketing, or indexing such abstract in accordance with the rules and requirements relating to judgments of the court of the State where the district court is located, the abstract of judgment shall be a lien on the property of the defendant located in such State

19  in the same manner and to the same extent and under the same conditions as a judgment of a court of general jurisdiction in that State.

20  (2) An order of in-kind restitution in the form of services shall be enforced by the probation officer.
   (n) If a person obligated to provide restitution, or pay a fine, receives substantial resources from any source, including

21  inheritance, settlement, or other judgment, during a period of incarceration, such person shall be required to apply the value of such resources to any restitution or fine still owed.
   (o) A sentence that imposes an order of restitution is a final judgment notwithstanding the fact that--

22  (1) such a sentence can subsequently be--
   (A) corrected under Rule 35 of the Federal Rules of Criminal Procedure and section 3742 of chapter 235 of this title;

23  (B) appealed and modified under section 3742;
   (C) amended under subsection (d)(5); or

24  (D) adjusted under section 3664(k), 3572, or 3613A; or
   (2) the defendant may be resentenced under section 3565 or 3614.

25  (p) Nothing in this section or sections 2248, 2259, 2264, 2327, 3663, and 3663A and arising out of the application of such sections, shall be construed to create a cause of action not otherwise authorized in favor of any person against the United States or any officer or employee of the United States.

26

1    government has not chosen to repair the N08 since the slide, may point to a number of

2    conclusions which may include abandonment.  If so, the argument could be made that the value

3    of the N08 may be less than the cost of repair.

4         The evidence also suggests that considerable mining activity may have occurred on-site

5    prior to the defendants' ownership.  Both the government and the defense recognize that large

6    amounts of rock and soil may have been removed over time from the base of the slope. [Exs. 36,

7    figure 2; and G, figure 3].   It is possible that defendants' damages could be reduced or mitigated

8    if permitted to argue comparative fault or negligence.

9    2.  Financial Resources of the Defendants.

10        Here, the court cannot link defendants' ability to pay restitution to any type of

11   rehabilitative goal.  See, United States v. Day, 418 F.3d 746, 757 (7th Cir. 2005).  A goal in

12   ordering restitution is not necessarily to provide full compensation of damages to the victims of

13   the crime, but as a way of correcting defendant's behavior and as a deterrence to impress upon

14   the defendant the seriousness and cost of his offense.  United States v. Peterson, 98 F.3d. 502,

15   510 (9th Cir. 1996).  § 3614(b)(2).  Here, the court is wary to impose restitution for what it

16   considers  nonrehabilitative purposes.  Since one of the goals of restitution is rehabilitation, its

17   imposition forces an offender to recognize the specific consequences of his criminal activity and

18   accept responsibility for those consequences.  A restitution award in a criminal case should not

19   represent compensation for harm resulting from an act that might only be considered negligence

20   in a civil setting.

21        The court is also concerned that any order of restitution imposed upon Ganoe or McKay

22   would necessarily result in a windfall to McFarlin.  Although, the court did not find McFarlin

23   guilty of any of the charges in the Information, it does appear that McFarlin may have been

24   culpable in the slide's causation. [Proposed Ex. A].

25   3.  Complexity in Determining Restitution.

26        Here, the court finds that restitution is a poor substitute for civil litigation.  A party sued

29

civilly has important due process rights, including appropriate pleadings, discovery, and a right to a trial by jury on the specific issues of liability of damages.

Neither party has had the opportunity to conduct discovery including taking the depositions of the opposing party experts.  Although the procedure outlined in § 3664(d)(4) allows for a hearing, it does not envision the protections generally afforded in civil litigation which would include the right to a jury trial.[24]  Defendants would be allowed to properly explore the possible comparative negligence or fault, if any, of the former owners of the mine, conduct discovery, and investigate their claim of spoilation of evidence, etc.  This would include the ability to testify at time of trial, since the defendants know better than anyone else what occurred at the Paystreak.  Each side would also be afforded opportunities to retool their estimates of damages since both appear highly unrealistic under the circumstances.

There are other reasons to not impose restitution in the present case.  Although the court finds that the slide was the result of defendants' mining activity, it is clear that the defendants did not intend for the slide to occur.  The court recognizes that all of the charges against defendants are general intent crimes and require no mens rea.  United States v. Wilson, 438 F.2d 525 (9th Cir.1971) (interpreting a Title 36 C.F.R. violation).  Imposing a large amount of restitution for an unintentional consequence would not be appropriate under the circumstances.  This is coupled with the fact that the site had been previously mined, and it is relatively easy to surmise that the slope may have been weakened by this activity.

The court is also reluctant to impose such a large monetary obligation upon defendants in the form of restitution by way of conviction of  Class B misdemeanors.  These cases do not require juries and rarely necessitate the appointment of counsel.  Although, the defendants in this case are represented by retained counsel, the court recognizes that defending a client in Class B misdemeanor prosecution, poses significant differences than defending a client in a property

---

[24]   The defendants unsuccessfully asserted their right to a jury trial on several occasions. [Docs. 21 and 24].

1  damage case involving complex issues of causation and damages.

2      The court is also concerned that the restitution sought by the government is 80 times

3  greater than the maximum fine as to each count.  For unrelated reasons, the MVRA limits an

4  award of restitution to the amount of fine.  § 3663(c)(2)(B).  Seeking restitution in an amount

5  significantly larger than the potential fine also raises concerns in situations where the defendant

6  is not fully apprised of the implications of restitution.  See generally, United States v. Pomazi,

7  851 F.2d 244, 247 (9th Cir.1988), abrogated on other ground sub nom.  Hughey v. United States,

8  495 U.S. 411 (1990); United States v. Rogers, 984 F.2d 314, 318 n. 5 (9th Cir.1993). See also

9  United States v. Kamer, 781 F.2d 1380 (9th Cir. 1986) (failure to expressly state restitution

10  request of over one million dollars in plea agreement amounted to a breach of the agreement).

11      For these reasons, the court declines to impose an award of restitution as a condition of

12  probation.

13  Appropriate Fines.

14      The court believes that Ganoe's sentence should be harsher than that of McKay.

15      The defendants' activities at the Paystreak were conducted without either special use

16  authorization, or approval by way of a POO.  The parties never submitted a timely NOI, yet

17  performed mining operations with the use of heavy equipment which resulted in "significant

18  disturbance of surface resources."  See, § 228.4 et seq.

19      Ganoe possessed a state certification as a professional geologist and apparently was a

20  retired government employee of the Department of Agriculture.  [Ex. D].  He chose to flaunt these

21  attributes when convenient to his cause.  In his letter to the forest service dated January 16, 2009,

22  he interjects his knowledge and assessment of the physical conditions and infirmities of the soil

23  and rock conditions at the Paystreak, and latter opines to the slide's causation.[25]  He also boldly

24  _____

25      [25]  In this letter Ganoe opines that the rock and soil are  "very unstable when on a slope or in a trench environment."
26  This is particularly disturbing since it suggests that Ganoe was particularly aware of the potential risks involved when excavating material below the N08.

1   suggests that the forest service should bear part of the blame or responsibility for the N08's failure,

2   by its consent in allowing the road to be originally built at its location above the mine.  [Ex. 7].

3          During the course of a meeting between the defendants and forest service personnel held

4   on February 19, 2009, Ganoe introduced himself as a retired geologist with the Soil Conservation

5   Service, and thereafter engaged Rose and de la Fuente in a conversation concerning the slide's

6   causation.  Although, defense counsel successfully prevented the government from introducing

7   evidence of Ganoe's professional background, Exhibit D was latter received into evidence without

8   objection or qualification.

9          The court finds it difficult to believe that Ganoe was not aware of his obligation to comply

10  with existing forest service mining regulations, but should this conclusion be incorrect, then the

11  court finds that based on his educational, employment and professional background, that he

12  should have been aware of these requirements.

13          **This Court imposes the following judgment**:

14  **As to Defendant McFarlin:**

15          The court finds Defendant McFarlin not guilty of all Counts in the Information.

16  **As to Defendant Ganoe:**

17          (1) That defendant Ganoe be placed on informal probation for a period of five years.

18          (2) That during the term of probation, he shall comply with the standard conditions of

19  probation as follows:

20          (a)     shall not commit another federal, state or local crime; and

21          (b)     shall notify the court within seventy-two hours of any change in residence or

22                  employment.

23          (3)  That as a special term of probation, defendant Ganoe shall not enter any federal lands,

24  including the Paystreak Mine, for any type of mining, prospecting or mineral exploration until

25  such time that all financial obligations imposed under this judgment have been satisfied.

26  Probation shall terminate upon successful completion of the financial obligations imposed by this

1  judgment.

2      (4)   Defendant Ganoe shall comply with provisions of 36 C.F.R. § 228, et seq., with

3  respect to any type of future mining, prospecting or mineral exploration at the Paystreak mine

4  including the filing of a NOI and obtaining a POO, when required.

5      (5)  As to Count I, defendant Ganoe is ordered to pay a fine in the sum of $ 5,000.00, plus

6  a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, for a total fine of $ 5,010.00 ;

7      (6) As to Count II, defendant Ganoe is ordered to pay a fine in the sum of $ 5,000.00, plus

8  a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, for a total fine of $ 5,010.00 ;

9      (7) As to Count III, defendant Ganoe is ordered to pay a fine in the sum of $ 5,000.00, plus

10  a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, for a total fine of $ 5,010.00 ;

11      (8) As to Count IV, defendant Ganoe is ordered to pay a fine in the sum of $5,000.00,  plus

12  a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, for a total fine of $ 5,010.00 ;

13      (9) As to Counts V through VIII, defendant Ganoe is ordered to pay a fine in the sum of

14  $ 250.00, plus a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, as to each count, for a

15  total fine of $ 1040.00;

16      (10) The total combined fines as to defendant Ganoe are $ 21,080.00.   Said fines shall be

17  paid in monthly installments of $ 500.00, or more, commencing February 1, 2011, and monthly

18  thereafter on the first day of each month until his fines are paid in full.

19  **As to Defendant McKay:**

20      (1) That defendant McKay be placed on informal probation for a period of five years.

21      (2) That during the term of probation, he shall comply with the standard conditions of

22  probation as follows:

23      (a)      shall not commit another federal, state or local crime; and

24      (b)      shall notify the court within seventy-two hours of any change in residence or

25              employment.

26      (3) That as a special term of probation, defendant McKay shall not enter any federal lands,

33

including the Paystreak Mine, for any type of mining, prospecting or mineral exploration until such time that all financial obligations imposed under this judgment have been satisfied. Probation shall terminate upon successful completion of the financial obligations imposed by this judgment

(4)   Defendant McKay shall comply with provisions of 36 C.F.R. § 228, et seq., with respect to any type of future mining, prospecting or mineral exploration at the Paystreak mine, including the filing of a NOI and obtaining a POO, when required.

(5)  As to Count I, defendant McKay is ordered to pay a fine in the sum of $ 2,500.00, plus a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, for a total fine of $ 2,510.00;

(6) As to Count II, defendant McKay is ordered to pay a fine in the sum of $ 2,500.00, plus a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, for a total fine of $ 2,510.00;

(7) As to Count III, defendant McKay is ordered to pay a fine in the sum of $ 2,500.00, plus a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, for a total fine of $ 2,510.00 ;

(8) As to Count IV, defendant McKay is ordered to pay a fine in the sum of  $ 2,500.00, plus a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, for a total fine of $ 2,5010.00 ;

(9) As to Counts V through VIII, defendant McKay is ordered to pay a fine in the sum of  $ 250.00, plus a $ 10.00 special assessment pursuant to 18 U.S.C. § 3013, as to each count, for a total fine of $ 1,040.00.

(10) The total combined fines as to defendant McKay are $ 11,080.00.   Said fines shall be paid in monthly installments of $ 200.00, or more, commencing February 1, 2011, and monthly thereafter on the first day of each month until his fines are paid in full.

Pursuant to Rule 58(g)(2)(13) and Rule 32(j) of the Federal Rules of Criminal Procedure, you have the right to appeal the judgment of conviction and/or sentence to the United States District Court  within ten (10) days of the entry of this Judgment.  You must file your Notice of Appeal with the Clerk of the United States District Court, Eastern District of California, 501 "I"

1  Street, Sacramento, California  95814.  You are further advised that if you are unable to pay the

2  costs of appeal, you may seek permission to appeal in forma pauperis.

3

4   DATED:  December 21, 2010

5

6                                         CRAIG M. KELLISON
                                          UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26